IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 3:12-CR-152 |
| | ) | |
| | ) | (MATTICE / GUYTON) |
| CAROL J. PAZDER, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.§ 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case is before the Court on Defendant Carol J. Pazder's Motion to Suppress Statements [Doc. 13], refiled[1] on June 28, 2013. The parties appeared for a hearing on the motion on September 4, 2013. Assistant United States Attorney Jennifer Kolman appeared on behalf of the Government. Attorneys Gregory P. Isaacs and Andrea Mohr represented the Defendant, who was also present. The Government presented the testimony of two witnesses, and counsel for both parties relied upon their briefs in lieu of argument. At the conclusion of the hearing, the Court took the motion under advisement.[2]

---

[1]On April 16, 2013, the Court granted [Doc. 18] the Defendant's motion to withdraw her suppression motion due to the entry of a signed plea agreement in this case. On June 13, 2013, District Judge Thomas A. Varlan permitted [Doc. 24] the Defendant to withdraw the plea agreement and continued the trial of this case to January 28, 2013. The Defendant moved [Doc. 25] to refile her suppression motion. The Court granted [Doc. 28] this unopposed motion.

[2]A Superseding Indictment [Doc. 34] was filed on December 3, 2013, adding Ms. Pazder's husband Richard Pazder as a codefendant. Mr. Pazder was given [Doc. 40] until January 13, 2014, to file motions and/or to join in Ms. Pazder's Motion to Suppress Statements.

1

# I. POSITIONS OF THE PARTIES

Defendant Carol Pazder is charged [Doc. 34][3] with two counts of making false statements on October 7, 2010, and November 1, 2010, in order to receive compensation from the Office of Worker's Compensation Program, and with three counts of making false and fraudulent statements on December 7, 2010; January 12, 2011; and February 10, 2011, to United States Postal Service agents that she was in too much pain to perform her duties and was entitled to workers' compensation.

The Defendant argues [Doc. 13] that the oral and written statements that she gave on December 7, 2010; January 12, 2011; and February 10, 2011, must be suppressed. She contends that these statements were made involuntarily and while she was under duress. She also argues that her January 12 and February 10, 2011 statements are the fruit of the unlawful and coercive interrogation that occurred on December 7, 2010.

The Government responds [Doc. 15] that <u>Miranda</u> warnings were not required for the three interviews because the Defendant was not in custody. It also argues that the totality of the circumstances surrounding each interview reveals that the Defendant made each of the three statements voluntarily.

---

No motions were filed by Mr. Pazder.

[3]Although at the time of the evidentiary hearing, the Defendant was charged in the initial Indictment, the Superseding Indictment did not add or materially change the charges against Ms. Pazder with regard to her motion. Instead, Counts 3 through 5 of the Superseding Indictment add a codefendant, Mr. Pazder; allege that Mr. and Ms. Pazder aided and abetted each other; and charge Ms. Pazder under 18 U.S.C. § 1002, as well as § 1001.

## II. SUMMARY OF THE TESTIMONY

At the September 4 hearing, the Government called two witnesses, Special Agent Michael Knobloch and Special Agent Beth Hendren, both from the United States Postal Service (USPS) Office of the Inspector General (OIG).

Special Agent Michael Knobloch testified that he had served as a special agent in the USPS Office of Inspector General for twenty-two years. He stated that the OIG received a complaint from Human Resources Manager Betty Furry, who had discovered that the Defendant, a USPS employee on "off-work status" for an injury, was going on a cruise. The Defendant reported a knee injury in April 2010, and was first placed on "limited-duty status" and later on off-work status. The OIG opened an investigation of the Defendant based upon the limited physical ability reported by the Defendant, the information that she was going on a cruise, and the Defendant's history of claims of physical injury. On October 9, 2010, undercover agents followed the Defendant while she was on a seven-day cruise. The agents observed the Defendant leave the ship for excursions. They saw her walking, shopping, and going to dinner and shows. On the cruise, the Defendant was observed doing activities that she had claimed she could not do.

Agent Knobloch stated that shortly after the Defendant returned from the cruise, she had an appointment with her treating physician. The Defendant told her doctor that she could not walk, lift, or bend and that she was not able to return to work. Her doctor continued her off-work status. Agent Knobloch said that the Defendant's representation of her abilities to her doctor contradicted what he and the other agents had observed on the cruise.

Agent Knobloch testified that OIG agents interviewed the Defendant three times during the investigation on December 7, 2010; January 12, 2011; and February 10, 2011. Before the first

3

interview, a letter purporting to be from a USPS quality assurance contractor was sent to the Defendant. The letter stated that the contractor wanted to see how the Defendant was doing and to assess her status. The letter was actually from Special Agent Derrick Bingham of the OIG. Agent Knobloch said that the purpose of this "soft interview" was to meet with the Defendant about her complaints, her condition, getting her back to work, and how they could assist her. The interview was initially scheduled to occur in London, Kentucky, but was changed to take place at the Marriott hotel in Knoxville, Tennessee, when the Defendant, who resides in Maryville, Tennessee, stated that she was not able to travel to Kentucky. The interview was conducted by Special Agents David Stelzer and Jeanna Koivula in a conference room at the Marriott. The conference room contained a table, refreshments consisting of water and mints, pictures on the walls, and a window. Agent Knobloch stated that the Defendant was not obligated to attend the meeting and that she would not have been arrested, if she had not appeared for the meeting.

Agent Knobloch stated that he did not attend the December 7 interview of the Defendant but that he watched the interview remotely as it occurred. The Defendant did not know that the meeting was being recorded[4] or that undercover law enforcement officers were conducting the interview. The agents conducting the interview did not show a gun or handcuffs during the meeting. The Defendant arrived in her own car with her husband Rick Pazder. The Defendant's husband was allowed to attend the meeting with her, to answer questions along with the Defendant, and to complete a form for her. Agent Knobloch stated that completion of this form was voluntary. Near the end of the meeting, the Defendant then reviewed this form, entitled the Current Capability Evaluation Plan, to

---

[4]The parties stipulated to a copy [Exh. B] of the recording, which they asked the Court to review.

assure its accuracy and signed it. Agent Knobloch stated that during the interview, the Defendant was never threatened with the loss of her job.

With regard to the December 7 meeting, Agent Knobloch testified that the Defendant and her husband were seated closest to the door, while the interviewing agents sat across the table from the couple. Agent Knobloch stated that although the door to the conference room was closed during the meeting, it was not locked and that the Defendant could have left the room at any time. He said that the Defendant provided information in response to the agents' open-ended questions, asked questions, and never said that she wanted to leave. According to Agent Knobloch, the Defendant was not accused of lying about her injury during the meeting. The Defendant was upset about the medical care she was receiving and stated that she had contacted her Congressman about the matter. The Defendant told the agents her concerns about the treatment she was receiving. The Defendant and her husband stayed until the interview was complete.

Agent Knobloch stated that at the December 7 meeting, the agents did not advise the Defendant of the Garrity warnings. He stated that these warnings were not given because the agents were undercover and the Defendant was not aware that they were law enforcement officers. He said also, the warnings were not necessary because the Defendant was not in custody. The meeting lasted a little over two hours. Agent Knobloch did not recall the Defendant asking for an attorney during the meeting. He stated that if the Defendant had requested an attorney, the agents would have ended the meeting and told the Defendant to get an attorney.

Agent Knobloch next testified about the January 12, 2011 interview. Special OIG Agents Lance Gregory and Beth Hendren interviewed the Defendant in Knoxville. Agent Knobloch said that he did not interview the Defendant because he was one of the agents who had followed her on

the cruise. He stated that he briefed Agents Gregory and Hendren about the case. The purpose of this interview was to inform the Defendant that the OIG had received a complaint about her. The Defendant was aware that OIG agents were conducting the interview. Agent Knobloch stated that this was also a soft interview, in which the Defendant was not confronted with or accused of lying. The agents asked open-ended questions and the Defendant gave information.

Agent Knobloch stated that the third interview occurred on February 10, 2011. He said that he contacted the Knoxville Processing and Distribution Center where the Defendant was employed and asked them to have the Defendant come for an interview. The Defendant was aware that she would be meeting with OIG agents but was not advised of the subject of the meeting in advance. The Defendant was not required to attend the meeting. Agent Knobloch said that the purpose of this meeting was to interrogate the Defendant about the facts and circumstances he had learned during the investigation.

Agent Knobloch testified that he and Special Agent in Charge Fred Johnson met with the Defendant in a meeting room next to the supervisor's office at the Knoxville Processing and Distribution Center. The room was a standard, medium-sized conference room with a table surrounded by chairs and a single door. The Defendant drove herself to the meeting, which she attended with her husband. The Defendant's husband, who is a former USPS employee and has also filed an injury claim in the past, answered questions and made comments during the meeting. Agent Knobloch stated that the Defendant was free to leave. The door was closed during the meeting but was not locked. When the Defendant and her husband entered the room, Agents Knobloch and Johnson were already seated, and the Defendant and her husband sat across the table from them. The agents introduced themselves and showed their credentials, but the Defendant did not recognize

6

Agent Knobloch, who had been on the cruise. The agents asked the couple if they needed anything.

Agent Knobloch stated that he then advised the Defendant of the <u>Garrity</u> rights using the USPS OIG Acknowledgment of Rights form [Exh. G]. He said that this is the form used by OIG agents when interviewing the target of an investigation on matters of guilt. He explained to the Defendant that she was not waiving her rights by initialing the form but was affirming that she understood them. He said that he advised the Defendant of each right, and she initialed it. He stated that using the form, he advised the Defendant of her right to remain silent, that she was free to leave, that she could refuse to answer questions, and that anything she said could be used in administrative or other proceedings. After initialing each right, the Defendant signed the form. Agent Johnson also signed the form as a witness. After being advised of the <u>Garrity</u> rights, the Defendant continued with the interview.

Agent Knobloch testified that following the advice of rights, the interview began at 11:22 a.m. The Defendant stated that she had a dental appointment and would have to leave at a certain time. During the first part of the interview, the Defendant did not request an attorney, nor did her husband request an attorney on her behalf. The Defendant did not decline to be interviewed or refuse to answer any questions. Her husband did not direct her not to answer any questions. According to Agent Knobloch, the Defendant continued to make false statements during the first part of the interview. The interview was not recorded pursuant to OIG policy. During the interview, Agent Knobloch confronted the Defendant with lying about her condition and showed her a DVD of herself on the cruise. He stated that he did not move close to the Defendant, pound on the table, or threaten the Defendant with prison. The agents had not finished the interview when the Defendant had to leave for her dental appointment. Agent Knobloch asked if she wanted to return. She was not

7

Agent Knobloch, who had been on the cruise. The agents asked the couple if they needed anything.

Agent Knobloch stated that he then advised the Defendant of the <u>Garrity</u> rights using the USPS OIG Acknowledgment of Rights form [Exh. G]. He said that this is the form used by OIG agents when interviewing the target of an investigation on matters of guilt. He explained to the Defendant that she was not waiving her rights by initialing the form but was affirming that she understood them. He said that he advised the Defendant of each right, and she initialed it. He stated that using the form, he advised the Defendant of her right to remain silent, that she was free to leave, that she could refuse to answer questions, and that anything she said could be used in administrative or other proceedings. After initialing each right, the Defendant signed the form. Agent Johnson also signed the form as a witness. After being advised of the <u>Garrity</u> rights, the Defendant continued with the interview.

Agent Knobloch testified that following the advice of rights, the interview began at 11:22 a.m. The Defendant stated that she had a dental appointment and would have to leave at a certain time. During the first part of the interview, the Defendant did not request an attorney, nor did her husband request an attorney on her behalf. The Defendant did not decline to be interviewed or refuse to answer any questions. Her husband did not direct her not to answer any questions. According to Agent Knobloch, the Defendant continued to make false statements during the first part of the interview. The interview was not recorded pursuant to OIG policy. During the interview, Agent Knobloch confronted the Defendant with lying about her condition and showed her a DVD of herself on the cruise. He stated that he did not move close to the Defendant, pound on the table, or threaten the Defendant with prison. The agents had not finished the interview when the Defendant had to leave for her dental appointment. Agent Knobloch asked if she wanted to return. She was not

7

escaped out of the Distribution Center.

Agent Knobloch stated that the Defendant returned and resumed her interview at 3:39 p.m. He stated that he was surprised that she came back to complete the interview. Agent Knobloch reviewed the <u>Garrity</u> rights with the Defendant again, and she initialed the same form beside her signature from the earlier session. Agent Knobloch said that at the end of the second part of the February 10 interview, the Defendant voluntarily wrote out a sworn statement [Exh. H]. The form on which the Defendant wrote her statement set out that the individual making the statement does so voluntarily. The Defendant signed the statement. Agent Knobloch testified that after the Defendant made the written statement, she said that she wanted to hurt herself. Agents Knobloch and Johnson called the Employee Assistance Program (EAP) and had the Defendant talk with the representative. The agents left the room while the Defendant and her husband spoke with the EAP representative privately. When the Defendant finished talking with the EAP representative, Agent Knobloch told her he would be in contact with her later, and she and her husband left.

Agent Knobloch testified that the Defendant was not arrested or confined during any of the three interviews. He said that the Defendant was in her early fifties and was not intellectually impaired. Agent Knobloch stated that the Defendant has filed five injury claims during her seven years of tenure with the USPS and knew the procedures for making such claims.

On cross-examination, Agent Knobloch testified that his primary job responsibility is to investigate fraud at the USPS. He stated that the Defendant was the target of an OIG criminal investigation before she went on the cruise. Agent Knobloch said that he and three other agents went on the same seven-day cruise as the Defendant, maintained surveillance of her, and recorded her. He agreed that the purpose of this surveillance was to gather incriminating evidence to use against

8

her in a criminal prosecution. Before the cruise, Agent Knobloch reviewed the reports from Ms. Furry on the Defendant's medical restrictions. The Defendant had orthopedic surgery on her knee prior to the cruise. His investigation did not reveal that the surgery was unwarranted. He agreed that this surgery was consistent with the Defendant's complaint of slipping on an item and falling while at work at the USPS. Agent Knobloch was aware that Dr. Paul Naylor is the Defendant's treating physician through the Department of Labor Office of Workmen's Compensation Program. With regard to the Defendant's restrictions prior to the cruise, Agent Knobloch agreed that the Defendant was permitted to walk without the assistance of a cane or wheelchair, to walk unlimited distances, to climb stairs, and to go outside and to the grocery store. He acknowledged that Dr. Naylor essentially said the Defendant could do whatever she was able to do as she was healing from surgery as long as she could control the pain. The Defendant was restricted from lifting more than ten to fifteen pounds and had other restrictions that Agent Knobloch could not recall. Agent Knobloch did not know if Dr. Naylor knew that the Defendant was going on the cruise. Agent Knobloch agreed that in one of her statements, the Defendant said Dr. Naylor had told her to go on the cruise and to relax.

Agent Knobloch agreed that no one told the Defendant that she did not have to come to the three interviews. The December 7 interview of the Defendant was conducted by law enforcement officers from the USPS working in an undercover capacity. They did not ask the Defendant to sign a rights waiver or tell the Defendant that she was a target in a criminal investigation. Agent Knobloch agreed that the Defendant would not have been able to make a knowing, intelligent, and voluntary rights waiver at the December 7 interview. The Defendant was asked to sign a rights waiver in the two subsequent interviews on January 12 and February 10. Agent Knobloch stated that

facts had changed between the first and second interviews. He was not present for the second interview. He stated that he had no knowledge of the Defendant requesting an attorney during the second interview but that, if she had, the agents would have ended the interview immediately.

Agent Knobloch testified that he advised the Defendant of her Garrity rights in the third interview on February 10, 2011. He spent one or two minutes reading the form to her, then the Defendant signed the form and noted the time, 11:22 a.m., by her signature. After the Defendant returned from a dental appointment, she again initialed the rights waiver, noting the time of 3:39 p.m. Agent Knobloch testified about his memorandum [Exh. F] on the February 10 interview. He said that he did not tell the Defendant that she was a target in a criminal investigation but did inform her that she could be the subject of a criminal investigation. Agent Knobloch agreed that Miranda warnings and Garrity warnings are different. He stated that the Defendant was not given the Miranda warnings at any of the three interviews.

Agent Knobloch agreed that during the February 10 interview, the Defendant became very upset. He stated that at the start of that interview, in the middle, and even toward the end, the Defendant was calm, lucid, and answered the questions asked. He said the Defendant became upset "after she was aware of the severity of the investigation." He agreed that at the end of the interview, the Defendant was so upset that she threatened to kill herself. Because she made this threat, Agent Knobloch was required to contact the Employee Assistance Program. Agent Knobloch said that the end of the interview was intense and that he raised his tone of voice but did not yell at the Defendant. He also denied ever pounding the table during the interview. He said that he asked very direct questions and asked the Defendant to be honest. He admitted that he told the Defendant she could be prosecuted.

10

The Government also called Special Agent Beth Hendren. Agent Hendren testified that she has worked as an USPS OIG agent for ten years. She said in January 2011, Agent Knobloch briefed her on the Defendant and asked her to interview the Defendant to gather information. Agent Knobloch scheduled a meeting with the Defendant at the Weisgarber Post Office in Knoxville, Tennessee. Agent Hendren could not get to the Weisgarber Post Office on that day due to snow and ice. She contacted the Defendant, identified herself as an OIG agent, and rescheduled the meeting for a mutually agreeable time at the Maryville Post Office, which is near the Defendant's residence. Agent Hendren said the purpose of this interview was to talk with the Defendant about her Worker's Compensation claim and to observe her current status. She stated that it was a "soft" interview with a conversational tone and open-ended questions.

Agent Hendren stated that she and Agent Lance Gregory met with the Defendant and her husband in a large office, used by supervisors. The office had two doors, which were closed during the interview to block noise from the workroom but were not locked. The Defendant came with her husband, who was allowed to attend and participate in the interview. The agents pulled four chairs around a large, rectangular folding table, which was already set up. When the Defendant and her husband entered, they sat in two of the chairs and the agents sat down after them. The Defendant had access to either door. The Defendant stood once during the interview but declined the offer to take a break. A supervisor knocked and entered the room a couple of times during the interview to retrieve items from his desk.

Agent Hendren testified that at the start of the interview, she and Agent Gregory identified themselves, showed their badges and credentials to the Defendant, and explained the function of the OIG. Agent Hendren told the Defendant that they were there to discuss her work-related injury.

11

She then advised the Defendant of the warnings on the <u>Garrity</u> form.  Agent Hendren read the top portion of the form to the Defendant, while the Defendant had the form in front of her.  Then, she had the Defendant read the four acknowledgments to her.  She asked the Defendant if she understood the acknowledgments.  Then, Agent Hendren asked Defendant to  initial each acknowledgment, after the Defendant said she understood it.  Agent Hendren identified the waiver form [Exh. E], which the Defendant had initialed and signed.  The interview began at 1:00 p.m. and lasted about one hour and fifteen minutes.

Agent Hendren stated that she told the Defendant at the beginning of the interview that it was voluntary.  Agent Hendren asked the Defendant to tell about her injury.  The Defendant did not refuse to answer any questions, nor did her husband instruct her not to answer any questions.  Agent Hendren stated that the Defendant's job was never threatened during the interview.  She did not recall the Defendant asking if she needed an attorney, but Agent Hendren said that her standard answer to that question is that she cannot advise the person about an attorney but that it is up to the person whether to get one.  Pursuant to USPS policy, the interview was not recorded.  Agent Hendren stated that although she was armed during the interview and carried handcuffs, her weapon and handcuffs were covered, and she did not show them to the Defendant.

On cross-examination, Agent Hendren testified that when Agent Knobloch briefed her about interviewing the Defendant, he said that she did not need to confront the Defendant with the evidence that he had collected on the cruise.  Instead, he told her to conduct a soft, conversational interview.  She agreed that the purpose of the interview was to gather information to assist in the criminal investigation of the Defendant.  Agent Hendren stated that she informed the Defendant that an allegation had been made to the OIG that the Defendant had gone on a cruise and had performed

12

activities inconsistent with her physical condition as described to the Department of Labor. Agent Hendron did not present any evidence to the Defendant during the interview and did not tell the Defendant that she had been followed and videotaped on the cruise. Agent Hendren stated that she was not aware of what evidence, including video footage, existed in the case. She did not tell the Defendant that the December 7, 2010 interview was conducted by undercover OIG agents or advise the Defendant of the <u>Miranda</u> rights. She did not recall the Defendant asking whether she needed a lawyer during the interview but stated that it was possible that the Defendant did ask that.

### III.  FINDINGS OF FACT

Based upon the testimony and the exhibits from the evidentiary hearing, the Court makes the following factual findings:

In April 2010, Carol Pazder, an employee of the United States Postal Service in Knoxville, Tennessee, reported an injury sustained while at work. The Defendant was first placed on limited-duty status and later on off-work status. Dr. Paul Naylor treated the Defendant's injury and performed surgery on her knee in September 2010. Both before and during her recovery from the surgery, Dr. Naylor placed the Defendant on "off work" status.

In the fall of 2010, USPS Human Resources Manager Betty Furry filed a complaint regarding the Defendant with the USPS Office of Inspector General. Ms. Furry informed the OIG that despite the Defendant's claims that she could not work due to limited physical ability, the Defendant was going on a cruise in October. Four undercover OIG agents followed and watched the Defendant, while she was on the seven-day cruise, and took surreptitious video recordings of the Defendant. Special OIG Agent Michael Knobloch was one of the undercover agents and led

the investigation of the complaint against the Defendant.

Following the Defendant's return from the cruise, OIG Special Agent Derrick Bingham sent a letter to the Defendant. The letter purported to be from an USPS quality assurance contractor and asked the Defendant to meet with the contractor in London, Kentucky, to assess the status of her injury. The location of the meeting was changed to the Marriott hotel in Knoxville, Tennessee, when the Defendant responded that she was not able to travel to Kentucky. On December 7, 2010, the Defendant and her husband arrived at the Marriott in Knoxville and met in a conference room with OIG Agents David Stelzer and Jeanna Koivula, who posed as quality assurance contractors. The Defendant answered questions about her injury and treatment. The Defendant also expressed her displeasure with the medical care she had received through the USPS and told the agents that she had contacted her Congressman about the situation.

During the December 7 meeting, the Defendant and her husband sat at a table across from the undercover agents. The couple had unimpeded access to the door, which was closed but not locked. Near the end of the meeting, Mr. Pazder filled out a form entitled Current Capability Evaluation Plan for the Defendant. The Defendant then reviewed the form and signed it. The meeting lasted about two hours and was recorded, unbeknownst to the Defendant. During the meeting, the Defendant was not informed that she was the target of a criminal investigation, was not advised of her rights, was not confronted with her actions on or any video footage from the cruise, and was never threatened with loss of her job or her Worker's Compensation benefits. The Defendant did not request an attorney during this meeting. Agent Knobloch, who was concerned that the Defendant might recognize him from the cruise, watched the interview as it occurred by way of a computer screen in another room at the Marriott.

Agent Knobloch next arranged for the Defendant to meet with OIG agents in Knoxville on January 12, 2011. Prior to the meeting, Agent Knobloch briefed Special Agent Beth Hendren about the Defendant's case. On January 12, 2011, Agent Hendren and Special Agent Lance Gregory, both of the USPS OIG, interviewed the Defendant at a post office in Maryville, Tennessee. The Defendant arrived for the interview with her husband, and the couple sat across from the agents at a table in the postal supervisor's office. The Defendant had access to both doors to the office. Although the doors were closed during the interview to block noise from the workroom, they were not locked, and a supervisor entered on a couple of occasions to retrieve items from his desk.

At the start of the January 12 interview, Agents Hendren and Gregory identified themselves as OIG agents and showed their badges and credentials to the Defendant. The agents explained the function of the OIG. Agent Hendren informed the Defendant that they were there to discuss her work-related injury. Agent Hendren then reviewed an Acknowledgment of Rights form with the Defendant. The Defendant read the four statements of rights[5] listed on the form aloud, initialed

---

[5]The rights listed on the Acknowledgment of Rights form are as follows:

 1. I have the right to remain silent if my answers may result in a criminal charge being brought against me.

 2. Anything I say or do may be used as evidence in administrative proceedings, civil proceedings, or any future criminal proceeding involving me.

 3. If I refuse to answer the questions posed to me on the grounds that the answers may tend to incriminate me, I cannot be discharged solely for remaining silent.

 4. This interview is strictly voluntary and I may leave at any time.

[Exh. E]

each one, and signed the form. The Defendant told Agent Hendren that she understood each of the rights listed on the form. The interview began at 1:00 p.m. and lasted one hour and fifteen minutes. Agent Hendren informed the Defendant that the interview was voluntary and that the OIG had received a complaint that she had gone on a cruise and engaged in activity inconsistent with her claimed physical condition. Agent Hendren asked the Defendant questions about her injury but did not confront the Defendant with the surveillance from the cruise or tell her that the December 2010 interview was conducted by undercover OIG agents. The Defendant did not ask for an attorney during the interview.

At the request of Agent Knobloch, the USPS Knoxville Processing and Distribution Center, where the Defendant had worked at the time of her injury, contacted the Defendant and scheduled an interview for her with OIG agents on February 10, 2011. On that day, Agent Knobloch and Special Agent in Charge Fred Johnson met with the Defendant and her husband in a conference room at the center. The couple sat across a table from the agents, and the door to the room was closed but not locked. At the start of the meeting, the agents introduced themselves and showed the Defendant their credentials. Agent Knobloch then advised the Defendant of her rights using a Acknowledgment of Rights form.[5] The Defendant initialed each rights statement on the form, after Agent Knobloch reviewed it. The Defendant then signed the form and recorded the time of 11:22 a.m.

The agents did not read the Miranda warnings to the Defendant, but Agent Knobloch told her that she could be the subject of a criminal investigation. During the interview, Agent Knobloch

---

[5]This Acknowledgment of Rights Form is identical in substance to the form used at the January 12, 2011 interview but bears a different address for the USPS OIG and appears to be in a smaller font.

accused the Defendant of lying about her condition and confronted her with video footage from the cruise.  The Defendant answered questions in a calm and lucid manner.  The Defendant ended the interview at 1:47 p.m., when she had to leave for a dental appointment.  Agent Knoblock had not finished questioning the Defendant and invited her to return to complete the interview after her appointment.  The Defendant and her husband then left the interview unescorted by the agents.

The Defendant and her husband returned to the Knoxville Processing and Distribution Center and resumed the interview at 3:39 p.m.  Agent Knobloch again reviewed the Acknowledgment of Rights form with the Defendant.  The Defendant initialed the form beside her signature.  The Defendant again answered questions calmly.  Agent Knobloch characterized this portion of the interview as intense and stated that although he did not yell at the Defendant, he raised his voice and asked her to be honest.  Near the end of this second interview, the Defendant wrote out and signed a sworn statement.  After she signed the written statement, the Defendant became upset and threatened to kill herself.  The agents had the Defendant speak with an Employee Assistance Program representative by telephone privately before she and her husband left.

## IV. ANALYSIS

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself."  In light of this protection, the Supreme Court has held that law enforcement cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment.  Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998).  "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial."  Stansbury v. California,

511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948. Additionally, in 1967, the Supreme Court extended the constitutional protection against compelled confessions to the statements of public employees "obtained under threat of removal from office[.]" Garrity v. New Jersey, 385 U.S. 493, 500 (1967). Thus, statements by a public employee gained under the threat of loss of the employee's job cannot be used in a subsequent criminal proceeding. Id.

Even when the Miranda warnings are administered, the government must prove that the defendant voluntarily, knowingly, and intelligently waived those Miranda rights before it may introduce an incriminating statement by a defendant. Colorado v. Connelly, 479 U.S. 157, 169-70 (1986). The government bears the burden of proving the voluntariness of the waiver by the preponderance of the evidence. Id. at 168. To determine whether a confession was voluntary, the court must examine the following factors in light of the totality of the circumstances: (1) whether the police conduct was objectively coercive, (2) whether the coercive police conduct was sufficient to overbear the defendant's will when viewed subjectively from the defendant's state of mind, and (3) whether the coercive police conduct was in fact the cause of the defendant's will being overborne. McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Connelly, 479 U.S. at 167. "If the police misconduct at issue was not the 'crucial motivating factor' behind petitioner's decision to confess, the confession may not be suppressed." McCall, 863 F.2d at 459 (citing Connelly, 479 U.S. at 163-64).

In the instant case, the Defendant argues that her statements made during interviews on December 7, 2010, and January 12 and February 10, 2011, must be suppressed because they were

18

made involuntarily and while under duress. The Court examines the circumstances of each of the Defendant's statements in turn to determine (1) whether the Miranda warnings were required, and (2) whether the Defendant's statements were the product of police coercion.

### A. December 7, 2010 Interview

On December 7, 2010, the Defendant participated in an interview conducted at the Marriott hotel in Knoxville, Tennessee, by undercover OIG agents posing as USPS quality assurance contractors. The Defendant allegedly gave false statements[6] about the extent of her physical limitations during this interview. The Defendant contends that the information she gave at the December 7, 2010 interview must be suppressed because she gave the information involuntarily and pursuant to coercion and duress. She states that although the true purpose of the interview was to obtain incriminating information, she was not aware that she was speaking to federal agents, she was not advised of her rights under Miranda or Garrity, and she did not waive those rights.

*(1) Were the Miranda warnings required at the December 7, 2010 Interview?*

First, the Court readily finds that the interviewing agents did not have to advise the Defendant of her rights pursuant to Miranda during the December 7, 2010 interview. The Supreme Court has definitively held that "Miranda warnings are not required when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement." Illinois v.

---

[6]The Court makes no finding with regard to the veracity of the Defendant's statements. This is the crux of the issue to be determined by the jury. See Fed. R. Crim. P. 12(b)(2) (permitting the parties to file pretrial motions on any matter "the court can determine without a trial of the general issue"). Instead, the issue before the Court is whether the jury gets to learn of those statements or whether those statements must be suppressed because they were coerced.

Perkins, 496 U.S. 292, 294 (1990). The policy behind providing the Miranda warnings is the belief that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Miranda, 384 U.S. at 467. On the other hand, when an individual voluntarily speaks with someone, whom they believe is not a law enforcement agent, then those "inherently compelling pressures" stemming from custodial interrogation are not present, even if the interviewer is actually an undercover agent. Perkins, 496 U.S. at 296; see also Hoffa v. United States, 385 U.S. 293, 304 (1966) (declining to entertain a Fifth Amendment challenge to the defendant's statements about bribing jurors made to an undercover government informant whom the defendant had invited into his hotel room). "There is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess." Perkins, 496 U.S. at 296-97. "Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within Miranda's concerns." Id.

In the instant case, Defendant Pazder did not know that the persons interviewing her during the December 7, 2010 meeting were OIG agents, nor that they suspected her of fraud. In other words, the Defendant had no reason to believe that the undercover agents "had any legal authority to force [her] to answer questions or that [they] could affect [her] future treatment" with regard to criminal prosecution. Id. The Court finds that the Miranda warnings were not required for the

December 7, 2010 interview.[7] Similarly, the <u>Garrity</u> warnings were not required because the Defendant had no reason to believe that her job was in jeopardy if she refused to talk to the quality assurance contractors.

*(2) Voluntariness of Statement*

The Defendant also argues that the information she provided during the December 7 interview was given under coercion or duress. The Defendant alleges her statements during the December 7 interview were coerced because (1) she lacked any experience with criminal law, (2) she was told her attendance at the meeting was mandatory, (3) the agents manipulated her by posing as quality assurance contractors during the meeting, (4) she was not advised of her rights pursuant to <u>Miranda</u> or <u>Garrity</u>, and (5) she did not feel free to leave.

The concern over a coerced confession stems from both the Fifth Amendment's protection against forced self incrimination and also the Due Process clause. <u>Dickerson v. United States</u>, 530 U.S. 428, 432-34 (2000) (observing that the Court has "never abandoned this due process jurisprudence, and thus continues to exclude confessions that were obtained involuntarily"). "The requirement that <u>Miranda</u> warnings be given does not, of course, dispense with the voluntariness

---

[7]In addition to the absence of law enforcement presence or pressure, the Court also finds that the circumstances surrounding the December 7, 2010 meeting reveal that the Defendant was not in police custody. The interview took place in a hotel conference room, a location chosen to accommodate the Defendant, and lasted about two hours. The Defendant arrived at the interview with her husband, who remained with her during the interview and helped her fill out a form. The Defendant and her husband were seated across a table from the undercover agents and had unimpeded access to the door. No evidence was presented that indicates the Defendant's movements were in anyway restricted, and the Court's review of the recording of the interview confirms that she was not so restrained. The Court finds that the December 7 interview was not custodial, which is a second reason why the <u>Miranda</u> warnings were not required.

21

inquiry." <u>Id.</u> at 444. As discussed above, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" <u>Connelly</u>, 479 U.S. at 167. Moreover, the coercive police activity must be the primary motivation for the Defendant's decision to give the statement before suppression of the statement is warranted. <u>McCall</u>, 863 F.2d at 459 (citing <u>Connelly</u>, 479 U.S. at 163-64).

In the present case, the Court finds no evidence that the interviewing agents coerced the Defendant. The Defendant appeared at the interview of her own accord. The agents asked open-ended questions about the Defendant's injury, treatment, and physical ability and maintained a friendly and sympathetic tone throughout the interview. The agents remained calm, even when the Defendant became strident, expressing her displeasure in the way in which her medical care had been handled. Although the Defendant states that she had no experience with the criminal law at the time of the interview, the Defendant was not subjected to a custodial interview and was not threatened with criminal prosecution. Thus, the agents did not take advantage of the Defendant's inexperience with criminal law. Moreover, Agent Knobloch testified that the Defendant had filed five Worker's Compensation claims in the past. This history suggests that the Defendant had prior experience with questions regarding injuries and medical treatment. Although the Defendant contends that she was required to attend the meeting, the Court received no evidence that she was either required to attend or prevented from leaving. Likewise, the Court has no evidence that the Defendant's job or her receipt of Worker's Compensation benefits were threatened during the interview.

The Defendant's primary complaint is that the agents deceived her by posing as quality assurance contractors. She likens this case to the police coercion in <u>Lynumn v. Illinois</u>, 372 U.S.

528 (1963). In <u>Lynumn</u>, the Court found a young woman's statement to be the product of police coercion:

> It is thus abundantly clear that the petitioner's oral confession was made only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not "cooperate." These threats were made while she was encircled in her apartment by three police officers and a twice convicted felon who had purportedly "set her up." There was no friend or adviser to whom she might turn. She had had no previous experience with the criminal law, and had no reason not to believe that the police had ample power to carry out their threats.

<u>Id.</u> at 534. Thus, the police coercion came from the officers' threats, which Lynumn did not know were unfounded. The Court of Appeals for the Sixth Circuit has likewise recognized that "[p]olice promises of leniency and threats of prosecution can be objectively coercive." <u>United States v. Johnson</u>, 351 F.3d 254, 261 (6th Cir. 2003). This problem arises in two situations: Threats and promises relating to the defendant and threats and promises as to third parties. <u>Id.</u>

In the instant case, the ruse–that the agents were USPS quality assurance contractors–did not involve any threats or promises to the Defendant or others. Moreover, the Defendant was familiar with the subject of Worker's Compensation benefits, having sought them for prior injuries, and she was not alone during the meeting. Instead, her husband attended the interview with her, commented on the discussion, and assisted her in completing a form. The mere fact that the agents were undercover was not coercive. <u>See</u> <u>Perkins</u>, 496 U.S. at 297 (1990) (holding that "<u>Miranda</u> forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one[, such as an undercover agent,] he supposes to be a fellow prisoner"); <u>Frazier v. Cupp</u>, 394 U.S. 731, 739 (1969) (determining that a false statement by law enforcement that codefendant had confessed and implicated the defendant did not render the defendant's statement involuntary).

23

"When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners." Perkins, 496 U.S. at 297. The Court finds that the Defendant's statements during the December 7, 2010 meeting were voluntarily made. Accordingly, her request to suppress her December 7, 2010 statements should be denied.

### B. January 12, 2011 Interview

The Defendant also maintains that her statements during the January 12, 2011 interview must be suppressed because they were involuntary and coerced. She argues that during this interview, she asked the agents if she needed a lawyer, but Special Agent Beth Hendren told her that she did not because the agents were merely following up on a complaint.

On January 12, 2011, the Defendant was interviewed in a conference room at a Maryville, Tennessee, post office by two OIG agents. The Defendant reviewed and signed an Acknowledgment of Rights form, which advised that she had the right to remain silent; that any statements she gave could be used against her in future administrative, civil, or criminal proceedings; that she could not be discharged for refusing to incriminate herself; that her participation in the interview was "strictly voluntary[,]" and that she could leave at any time. [Exh. E]. In Miranda, the Supreme Court required that "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444. Although the Acknowledgment of Rights form advised the Defendant of her rights under Garrity and provided most of the advice required by Miranda, the form did not

advise the Defendant that she had the right to counsel or that counsel would be provided if she could not afford to retain counsel herself. Moreover, Agent Hendren testified that she did not provide advice regarding attorneys. The Court finds that the complete Miranda warnings were not provided during the January 12, 2011 interview. Thus, the Court examines whether the Miranda warnings were required (i.e., whether the Defendant was subjected to custodial interrogation) and whether the Defendant's statements were the product of coercion by the agents, as the Defendant alleges.

*(1) Was the Defendant in police custody during the January 12, 2011 meeting?*

The obligation to administer Miranda warnings to suspects only arises if there has been "such a restriction on a person's freedom as to render him 'in custody.'" Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam). To determine whether an individual is in custody for purposes of Miranda, the Court examines the totality of the circumstances to assess how a reasonable person in that situation would have interpreted the situation. Salvo, 133 F.3d at 948; see also United States v. Swanson, 341 F.3d 524, 528 (6th Cir. 2003). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323; Mason v. Mitchell, 320 F.3d 604, 631 (6th Cir. 2003). The "'ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" United States v. Knox, 839 F.2d 285, 291 (6th Cir. 1988) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted); Swanson, 341 F.3d at 529.

In determining whether a defendant was in custody, the Court examines the totality of the

circumstances to ascertain a reasonable person's understanding of the situation. <u>Salvo</u>, 133 F.3d at 948. Relevant to the inquiry is whether a reasonable individual in the same position as the defendant would have felt free to leave. <u>Swanson</u>, 341 F.3d at 529. Other factors useful in making this determination are:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

<u>Salvo</u>, 133 F.3d at 950; <u>see also</u> <u>Swanson</u>, 341 F.3d at 529.

The Court finds that the January 12, 2011 interview of the Defendant was *not* custodial. Although the purpose of the interview was to investigate whether the Defendant was defrauding the USPS, none of the other factors reveal the interview to be custodial. The place of the questioning, a supervisor's office in a post office was not hostile or coercive. The interview was originally scheduled to occur in the post office at which the Defendant worked but was moved to a post office closer to the Defendant's home due to hazardous road conditions. Essentially, the Defendant was interviewed at a branch office of her employer. The Sixth Circuit has twice analyzed the interview of a defendant at his or her place of employment. In <u>United States v. Crossley</u>, the defendant was interviewed in a large classroom with windows at the military camp where she worked. 224 F.3d 847, 862 (6th Cir. 2000). The appellate court determined that the location, which was "not a confined space which could be intimidating[,]" to be one factor supporting its determination that the interview was noncustodial. <u>Id.</u> Similarly, in <u>United States v. Mahan</u>, our appellate court concluded that an employee questioned at his place of employment was not in custody. 190 F.3d

416, 422 (6th Cir. 1999). In the case before the Court, the Defendant came to the interview of her own accord and met with agents in a supervisor's office. The Defendant and her husband sat at a table across from the agents. The Court finds that the interview location was not hostile.

The third relevant factor is the length of the interview. Salvo, 133 F.3d at 950; Swanson, 341 F.3d at 529. Here, the interview occurred in the afternoon and lasted one hour and fifteen minutes. Agent Hendren described the tone of the interview as "soft" and conversational, with open-ended questions. She stated that the Defendant was not confronted with the fact that she had been followed and recorded while on the cruise. Agent Hendren stated that her handcuffs and service weapon were not visible during the interview. The Court concludes that the length and tone of the meeting were not designed to force the Defendant to confess.

Finally, the Court looks to whether the circumstances of the interview reveal "other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions." Salvo, 133 F.3d at 950; see also Swanson, 341 F.3d at 529. In the instant case, Agent Hendren told the Defendant that the interview was voluntary, and the Defendant signed a form acknowledging that the interview was voluntary and that she was free to leave. The Defendant's movements during the interview were not restrained. The Defendant stood at one point during the interview and was offered, but declined to take, a break. Although the doors to the office remained closed to block noise from the post office work room, the doors were not locked, and a supervisor entered and left the room during the interview. Importantly, the Defendant

had a support person, her husband, with her throughout the meeting.  The Court finds that the circumstances of the interview reveal that it was not custodial.

Based upon the totality of the circumstances, the Court finds that a reasonable person in the Defendant's situation would have felt that she could have ended the interview and left the post office.  The Court finds that the Defendant was not in custody and the <u>Miranda</u> warnings were not required.  Therefore, the fact that the Defendant was not advised that she had the right to an attorney at the January 12 interview is not constitutionally significant.  Although the Defendant contends that she asked whether she needed an attorney, the record is devoid of evidence that she requested counsel or asked about an attorney during the January 12 interview.[8]

*(2) Coercion*

Although the Defendant generally argues that her statements at all three interviews were not voluntary and were the product of police coercion, she makes no specific arguments regarding police coercion at the January 12, 2011 interview.  When a defendant advances no evidence of coercive activity on the part of law enforcement or evidence that his or her will was overborne by said activity, the defendant's statement will be deemed voluntary.  <u>United States v. Gatewood</u>, 230 F.3d at 186, 193 (6th Cir. 2000).  Moreover, the Court's own review of Agent Hendren's testimony about what transpired during the January 12, 2011 meeting reveals no coercion on the part of the

---

[8]On cross-examination, Agent Hendren agreed that it was possible that the Defendant asked whether she needed a lawyer, but she also repeated her testimony on direct examination that she did not recall the Defendant asking for one.  Agent Gregory, who conducted the January 12 interview with Agent Hendren, did not testify at the evidentiary hearing.  Agent Knobloch testified that he had no information that the Defendant had requested counsel during the January 12 interview but that, if she had, the agents would have ended the interview immediately.  The Court finds that the Defendant did not request counsel during the January 12, 2011 interview.

agents. Accordingly, the Court finds the Defendant's request to suppress her January 12, 2011 statements to Agents Hendren and Gregory should be denied.

### C. February 10, 2011 Interview

Finally, the Defendant contends that her statements to Agents Knoblock and Johnson on February 10, 2011, must be suppressed because she was not provided the Miranda warnings and her statements were compelled by police coercion. The Government argues that the Defendant was not in police custody during the February 10 meeting and, thus, the Miranda warnings were not required. It also argues that Garrity does not apply in this case, because the Defendant was never threatened with loss of her job. Moreover, the Government contends that the Defendant was advised of and waived her rights under Garrity.

As with the earlier two meetings, the Defendant came to the February 10 interview with her husband. The interview took place in a conference room at the Knoxville Processing and Distribution Center, which is where the Defendant had worked prior to her injury. The Defendant and Mr. Pazder entered the conference room and sat across from OIG Special Agents Knobloch and Johnson, who were already seated. The agents introduced themselves and showed their credentials. Agent Knobloch then reviewed an Acknowledgment of Rights form with the Defendant. The Defendant initialed each of the rights on the form and then signed it. The agents did not separately advise the Defendant of the Miranda warnings. As discussed above with regard to the January 12 meeting, the USPS OIG Acknowledgment of Rights form does not provide advice on the right to counsel. Accordingly, the Court again finds that although the Defendant received advice on her rights under Garrity (that she would not lose her job based solely upon her choice to exercise her

29

right to remain silent), the complete Miranda warnings were not provided during the February 10, 2011 interview. Thus, the Court examines whether the Miranda warnings were required (i.e., whether the Defendant was subject to custodial interrogation) and whether the Defendant's statements were the product of official coercion.

*(1) Custody*

The Court again turns to the totality of the circumstances surrounding the February 10 meeting to determine whether the Defendant was in law enforcement custody. See Salvo, 133 F.3d at 948 (holding that the court looks at the totality of the circumstances to ascertain whether a reasonable person would believe they were in police custody). As discussed above, relevant factors that inform the determination of whether the suspect felt free to leave are "(1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning;" (4) whether the suspect was told that the meeting was voluntary; and (5) whether the suspect initiated the meeting. Salvo, 133 F.3d at 950; see also Swanson, 341 F.3d at 529.

With regard to the February 10 meeting, the purpose of the interrogation was to confront the Defendant with her purported false statements and the video footage from the cruise. According to Agent Knobloch, this was not to be a "soft" interview, and he characterized the tone of the interview as intense. The Court finds that purpose and tone of the meeting support a finding that it was custodial. However, the remaining factors all support the conclusion that the interview was noncustodial. As with the January 12 interview, the Defendant was interviewed in a conference room in her place of employment. Nothing about the location of the interview was inherently hostile or coercive. See Crossley, 224 F.3d at 862; Mahan, 190 F.3d at 422.

The Defendant argues that the interview lasted approximately seven and one-half hours. The Court finds to the contrary. The Defendant initially signed the Acknowledgment of Rights form at 11:22 a.m. Agent Knobloch testified that the Defendant ended the interview at 1:47 p.m., because she had a dental appointment to keep. Agent Knobloch had not finished questioning the Defendant and invited her to return after her appointment to complete the interview. The Defendant returned and initialed the Acknowledgment of Rights form at 3:39 p.m. The second half of the meeting concluded after the Defendant provided a handwritten statement, upon which she entered the time of 6:36 p.m. The Court finds that the first part of the meeting lasted two hours and twenty-five minutes and the second half of the interview lasted just over three hours. Accordingly, the entire interview lasted around five and one-half hours with a two-hour break approximately halfway through the interview. Additionally, the entire interview took place during the daytime.

Although lengthy questioning can amount to police coercion, the questioning in this case does not rise to that level. See Ledbetter v. Edwards, 35 F.3d 1062, 1069 (6th Cir. 1994) (questioning from midnight to 3:00 a.m. not coercive); but, c.f., Spano v. New York, 360 U.S. 315, 322 (1959) (deeming questioning lasting eight consecutive hours through the night to be coercive). In the instant case, the Defendant was not questioned for five and one-half consecutive hours but left the interview to keep another appointment and then chose to return. Additionally, the Court observes that the Defendant spent part of the second half of the interview writing out a seven-page statement. While the February 10 interview was significantly longer than the earlier interviews, the two-hour break in the middle of the interview along with the facts that the interview occurred during the day and did not consist entirely of questioning reveal that the Defendant was not in police custody.

The Court also finds that the Defendant was told that the interview was voluntary. At the start of the interview, Agent Knobloch reviewed the Acknowledgment of Rights form with the Defendant. This form expressly states "this interview is strictly voluntary and I may leave at any time." [Exh. E] The Defendant signed the form, agreeing that she understood the rights listed therein. The Defendant not only knew that she could leave, but she, in fact, did leave during the interview in order to attend a dental appointment. Accordingly, the Court finds that the Defendant understood that she was free to leave.

Finally, the Court looks to whether the suspect initiated the meeting. In this case, while the OIG and USPS initiated the meeting, the Defendant chose to return after her dental appointment to complete the interview. The Court finds that this factor also supports a finding that the February 10 interview was not custodial. Looking at the totality of the circumstances, the Court finds that a reasonable person in the Defendant's situation would have felt free to leave. See Swanson, 341 F.3d at 529 (observing that the court examines the totality of the circumstances to determine whether a reasonable person in the defendant's position would have believed they could leave). Accordingly, the February 10, 2011 meeting was not custodial; and, thus, the Miranda warnings were not required.

*(2) Coercion*

The Defendant argues that her statements during the February 10 meeting were coerced because (1) she was subjected to seven and one-half hours of interrogation; (2) when she asked whether she should have an attorney or union representative present, she was told that was not necessary because the agents were simply following up on a complaint; (3) Agent Knobloch

invaded her space, pounded the table, and repeatedly threatened her with incarceration during the interview; and (4) she suffered a psychological breakdown during the interview and had to consult with an EAP representative before leaving. She contends that these circumstances created a situation in which her will was overborne at the time she confessed.

In assessing the voluntariness of a confession, the court looks to the totality of the circumstances–"both the characteristics of the accused and the details of the interrogation"– to determine whether "the confession [is] the product of an essentially free and unconstrained choice by its maker[.]" Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). "An admission is deemed to be coerced when the conduct of law enforcement officials is such as to overbear the accused's will to resist." Ledbetter v. Edwards, 35 F.3d 1062, 1068 (6th Cir. 1994). If a suspect's will has been overborne by police coercion, then his confession cannot be used against him without offending due process. Bustamonte, 412 U.S. at 227. When a defendant challenges the voluntariness of a confession, the Government must prove that the confession was voluntary by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 489 (1972); United States v. Wrice, 954 F.2d 406, 410 (6th Cir. 1992).

In assessing whether police coercion overbore the defendant's will, "the [c]ourt determine[s] the factual circumstances surrounding the confession, assesse[s] the psychological impact on the accused, and evaluate[s] the legal significance of how the accused reacted." Id. Either psychological or physical coercion can render a confession involuntary. Ledbetter, 35 F.3d at 1067.

> Factors to consider in assessing the totality of the circumstances include the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep.

33

Id. (citing Bustamonte, 412 U.S. at 227).

In the instant case, the fifty-eight-year-old[9] Defendant had worked for the USPS for seven years before her injury in April 2010.  The Court infers that she is at least of average intelligence and education level given her work history.  Although not advised of the right to counsel during the February 10 interview, the Defendant was twice advised of her rights, including her right to remain silent and that her participation in the interview was voluntary.  The interview took place in a medium-sized conference room in the USPS Knoxville Processing and Distribution Center.  The Defendant had a support person, her husband, with her during the entirety of the interview.

The Defendant contends that her statements were coerced because she was subjected to seven and one-half hours of interrogation.  As discussed above, the Court finds that the Defendant was questioned for five and one-half hours, with a two hour break around the midpoint of the interview.  Neither Agent Knobloch's testimony, nor his summary of the interview [Exh. F] reflect that the questioning in the interview was repeated or prolonged.  The Court has no evidence that the Defendant was deprived of food or sleep during the questioning.  Instead, the Court notes that the Defendant left the interview to go to a dental appointment approximately half-way through and returned of her own accord.  In Jackson v. McKee, our appellate court held that intermittent questioning during a forty-hour period was not coercive, when the defendant was advised of his rights four times, no single interview lasted more than two and one-half hours, and the defendant was not deprived of sleep.  525 F.3d 430, 434-35 (6th Cir. 2008).  The Court finds that the length of the instant February 10 interview, in which the Defendant arrived and left on her own schedule,

_____

[9]During the December 7, 2010 interview, the Defendant says that she is fifty-eight. [Exh. B]

34

is not as onerous as that in <u>Jackson</u> and is similarly not coercive.

The Defendant also argues that her statements were not voluntarily given because she was deprived of counsel. She alleges that when she asked whether she should have an attorney or union representative present, she was told that was not necessary because the agents were simply following up on a complaint. The Court has no evidence that the Defendant asked for either an attorney or a union representative at the February 10 meeting. Instead, Agent Knobloch testified that neither the Defendant, nor her husband, asked for an attorney during the interview. The Court finds that the Defendant did not ask for an attorney during the February 10 meeting.

The Defendant also argues that Agent Knobloch's tone during the February 10, 2011 interview was coercive. In support of this contention, the Defendant refers the Court to a letter she wrote to the Office of Worker's Compensation Programs dated September 29, 2011 [Doc. 13, Exh. I]. In this letter, the Defendant states

> Did [Agent Knobloch] tell you that my third interrogation was 7 1/2 hrs. long. [Sic.] A real get in your face, pound on the table, your [sic.] going to jail over and over interrogation. By the time they were done with me, I would have told him the moon was purple if he wanted.

[Doc. 13-8, Exh. I, p.3] The Defendant also argues that Agent Knobloch repeatedly told her she would go to jail for fraud if she did not confess.

This letter, which the Defendant wrote seven and one-half months after the interview, is contradicted by Agent Knobloch's testimony. Agent Knobloch denied getting in the Defendant's face, pounding on the table, or threatening the Defendant with prison if she did not confess. He stated that as the interview progressed, his tone grew more "intense" and "direct." He stated that he confronted the Defendant with footage of herself on the cruise and with lying to him and in her

35

prior interviews. He also said that he told the Defendant that she could face criminal prosecution. Nevertheless, he stated that the Defendant remained calm and lucid throughout the questioning. He stated that she did not become upset until after she had prepared the written statement.

The Court finds that the tone of the interview was not coercive. The Court finds Agent Knobloch's testimony regarding the tone of the February 10 interview and the Defendant's demeanor during the interview to be credible. Agent Knobloch's testimony is supported by the sworn statement prepared by the Defendant at the end of the interview. On the first page of the statement, the Defendant acknowledged that she was making the statement "freely, knowingly, and voluntarily, and without any threats or promises having been extended to me." [Exh. H] The Defendant initialed this statement and agreed that she had not been subjected to threats, after having been questioned by the agents. Additionally, the Court finds that the Defendant exaggerated the length of the interview in her September 29 letter. As discussed above, the interview was five and one-half, rather than seven and one-half, hours long with a two-hour break in the middle. The break occurred at the Defendant's request. During the break, the Defendant left the site of the interview to attend an appointment and returned of her own accord. The fact of the Defendant's leaving and returning contradicts her account of abusive questioning by Agent Knobloch. The Court doubts that the Defendant was overcome by Agent Knobloch's tone and actions when she chose not to cancel a dental appointment in order to complete the interview. Accordingly, the Court credits Agent Knobloch's account of the February 10 interview and not that of the Defendant in the September 29 letter.

Finally, the Defendant contends that her will was overborne because she suffered a psychological breakdown during the interview and had to consult with an EAP representative before

36

leaving.  Agent Knoblock testified that after the Defendant completed her written statement, she became upset and threatened to kill herself.  He stated that without regard to the seriousness of her threat, policy required that he refer her to the EAP.  In his memorandum [Exh. F] summarizing the February 10 interview, Agent Knobloch stated

> [a]t the conclusion of the interview Pazder commented on how she wanted to drive her vehicle off the cliff when she first had injured herself.  ASAC Johnson provided Pazder with the Employee's Assistance Program phone number.  Pazder and her husband remained in the interview room alone when she was talking to the EAP representative.

[Exh. F, p. 4]  Agent Knobloch testified that after the Defendant finished talking with the EAP representative, he advised her that the OIG would be in contact with her later and the Defendant and her husband left on their own.  First, the Court observes that the above-quoted summary reveals that the Defendant stated that she felt suicidal right after her injury in April 2010, not at that moment.  In any event, even if the Defendant's statement was that she felt suicidal at that moment, the Court finds that the Defendant's psychological distress occurred after the interview and after she made her sworn statement.  Moreover, the Defendant's reaction was not the result of police coercion.  Accordingly, the Court finds that the Defendant's psychological distress, if any, did not affect the voluntariness of the interview and statement, which she had already given.[10]

---

[10]The Defendant's motion states that "[f]ollowing the interrogation, Ms. Pazder spent five days in the Blount Memorial Hospital Emotional Health Clinic suffering from major depression and suicidal thoughts, and continued psychological therapy for a significant time thereafter." [Doc. 13, p. 9]  First, the Court notes that the only evidence in the record of the Defendant's hospitalization and therapy are the Defendant's references to this in her September 29, 2011 letter [Doc. 13-8, p. 3] to the Office of Workers' Compensation Programs.  In this letter, she states that she was admitted to Blount Memorial Hospital on February 17, 2011, and that the therapy occurred in the weeks following her release on February 21, 2011.  All of this occurred *after* the Defendant was interviewed on February 10, 2011.  The Court by no means discounts the Defendant's mental heath problems; but without more, the Court cannot infer that her mental

The Court finds that the statements, including the written statement, made by the Defendant during the February 10 interview were voluntarily made. Accordingly, the Court recommends that the Defendant's motion to suppress this statement be denied.

### D. Fruit of the Poisonous Tree

Finally, the Defendant argues that even if the January 12 and February 10, 2011 statements are found to be voluntarily given, they should be suppressed as fruit of her December 7, 2010 statement. The "fruit of the poisonous tree doctrine" excludes not only that evidence that was illegally seized, but all evidence gained from the "'exploitation'" of an illegal search and seizure unless that evidence is sufficiently attenuated from the illegal actions as to "'purge [it] of the primary taint.'" Wong Sun v. United States, 371 U.S. 471, 488 (1963) (citing Maguire, Evidence of Guilt, 221 (1959)).

First, the Court observes that it did not find the Defendant's December 7, 2010 statement to be involuntary or otherwise unconstitutional. Therefore, the fruit of the poisonous tree doctrine does not apply in this case. Moreover, assuming for the sake of argument that the December 7, 2010 statement was subject to the exclusionary rule, the subsequent statements are too attenuated from the initial illegality (again assuming *arguendo* that the December 7 statement was illegally gained) to be subject to suppression. The Defendant argues that "[t]he circumstances surrounding Ms. Pazder's oral and written statements during the January and February interrogations indicated that those statements were a direct product of the illegally obtained statements on December 7,

---

health treatment occurring days after the interview affected her participation during the interview.

2010." [Doc. 13, p.13] The Court disagrees. The subsequent interviews occurred over a month

later, at different locations, with different agents who identified themselves as OIG agents, and

following the Defendant being advised of and acknowledging her rights on both occasions. The

Court finds that there was a "clean break from the circumstances which surrounded the first

statement." United States v. Daniel, 932 F.2d 517, 521 (6th Cir. 1991) (holding that second

interview, conducted on the day after first interview and following receipt of the Miranda warnings,

was not tainted by any coerciveness present during first interview).


## V. CONCLUSION

After carefully considering the motion, memoranda, testimony, exhibits, and relevant

legal authorities, the Court finds no basis to suppress the Defendant's statements. For the reasons

set forth herein, it is **RECOMMENDED** that the Defendant's Motion to Suppress Statements [**Doc.**

**13**] be **DENIED**.[11]

Respectfully submitted,

s/ H. Bruce Guyton
United States Magistrate Judge

---

[11]Any objections to this report and recommendation must be served and filed within
fourteen (14) days after service of a copy of this recommended disposition on the objecting party.
Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified
waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v.
Branch, 537 F.3d 582, 587 (6th Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985)
(providing that failure to file objections in compliance with the required time period waives the
right to appeal the District Court's order). The District Court need not provide de novo review
where objections to this report and recommendation are frivolous, conclusive, or general. Mira
v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for
appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).